United States Court of Appeals
For the Eighth Circuit

_____

No. 19-1563
_____

United States of America

*Plaintiff - Appellee*

v.

Robert Phillip Ivers

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 15, 2020
Filed: July 23, 2020
_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Following a jury trial, Robert Ivers was convicted of one count of threatening to murder a federal judge, in violation of 18 U.S.C. § 115(a)(1)(B), and one count of interstate transmission of a threat to injure the person of another, in violation of 18

Appellate Case: 19-1563    Page: 1    Date Filed: 07/23/2020 Entry ID: 4937086

U.S.C. § 875(c). The district court[1] sentenced Ivers to 18 months imprisonment with three years of supervised release to follow. Ivers appeals his conviction, arguing that the statements at issue were privileged, that there was insufficient evidence suggesting that he made a true threat of present or future harm, that the district court erred in instructing the jury, and that the district court's cumulative errors deprived him of his right to a fair trial. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

"We recount the relevant testimony and other evidence presented at trial in the light most favorable to the jury's verdict." United States v. Shavers, 955 F.3d 685, 688 n.2 (8th Cir. 2020).

A.

In February 2015, Ivers filed a lawsuit in Minnesota state court against a life insurance company, which was then removed to federal court and eventually assigned to Judge Wilhelmina M. Wright of the District of Minnesota. See Ivers v. CMFG Life Ins. Co., No. 15-cv-1577-WMW-BRT (D. Minn. filed Mar. 23, 2015). In September 2016, Judge Wright entered an order granting summary judgment in favor of the life insurance company on all but one of Ivers's claims. The following month, Ivers mailed Judge Wright a packet of various court-related materials on which Ivers had written notes. These notes included statements such as "I do not know where I am fucking sleeping tonight! Think about it!"; "I am sick and tired of this fucking bullshit!"; "I want my fucking money . . . ."; "I will not negotiate!!!"; "Have I made myself clear!!!"; "I am in dire fucking straits!"; and "I am becoming a very dangerous person!!!"

---

[1] The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation in the District of Minnesota.

Although the case had been scheduled for a settlement conference before Magistrate Judge Becky R. Thorson, the conference was cancelled. And because neither party demanded a jury trial, the case was instead set for a bench trial before Judge Wright. In November 2016, Ivers sent a letter to the court, demanding "a jury trial or [his] fucking money." In that letter he also stated: "I smell a rat! Somebody needs to explain to me what the fuck is going on!?"

Ivers's communications were forwarded to the United States Marshals Service (USMS). Deputy Marshal Jeffrey Hattervig started investigating Ivers and learned that Ivers had previously threatened a Minnesota state court judge who presided over a separate civil action filed by Ivers. Ivers was later charged in state court with stalking and making terroristic threats, and following a trial, he was convicted of stalking. At the time of his statements to Judge Wright, he was on probation for this offense. Hattervig spoke with Ivers when he appeared at the federal courthouse for a pretrial hearing on January 4, 2017. Although Ivers was cordial and mentioned to Hattervig that his statements to Judge Wright were intended to speed up the proceedings, he signaled his frustration with the defendant life insurance company and stated that he did not want to "carry that hurt around inside" and that he would "be a walking bomb" if he did not vent his frustrations. Although he told Hattervig that he would accept the result of the trial, Hattervig remained concerned about Ivers's lack of remorse for his prior statements. This prompted the USMS to provide increased security at the trial, and Hattervig warned Ivers that sending threatening communications could be a crime.

Following trial, judgment was entered in favor of the life insurance company. Ivers later sent letters to Chief Judge John R. Tunheim and Magistrate Judge Thorson in which he requested a new trial and asserted that Judge Wright acted with bias against Ivers in disposing of the case. He later sent the same letter to Judge Wright and additional copies to Chief Judge Tunheim, Magistrate Judge Thorson, and the Clerk of Court. On the envelopes of some of those letters, he wrote notes stating that:

"I was cheated by one of your federal judges and I demand redress." On the letter to Judge Wright, Ivers wrote: "You cheated me and I will not stop smearing your name until I get redress." Ivers also called Chief Judge Tunheim's chambers to voice his displeasure with Judge Wright's decision and request that Chief Judge Tunheim take action. When Ivers was informed that the proper course of action would be to appeal his case to this Court, Ivers "was not happy with that" and mentioned that he "was crazy mad, and he didn't know what to do with it." Ivers again described himself as a "walking bomb because he was so frustrated." Chief Judge Tunheim's staff, concerned about Ivers's fixation on Judge Wright, contacted the USMS. A few days later, Ivers sent another round of letters, addressing one to "Corrupt Judge Wright" and demanding that she "pay attention." Copies of the letters to Chief Judge Tunheim, Magistrate Judge Thorson, and the Clerk of Court included a statement on the envelopes that said: "Judge Wright is a Corrupt! [sic] Judge."

Ivers's post-trial conduct prompted Deputy Marshals Hattervig and Farris Wooton to visit with Ivers at his residence to discuss his letters and calls. In particular, they were concerned about "the aggressive nature of [Ivers's] letters, the fixation on Judge Wright, the repeated mailings to multiple people, calling her corrupt, and the increased agitation against Judge Wright, coupled with the phrase 'walking bomb.'" Hattervig and Wooton hoped that Ivers would "show some contrition and say, okay, I realize that I crossed the line and I won't do it anymore." However, Ivers did not do that. Instead, he refused to retract his statements, remained visibly angry, and confirmed that he remained a "ticking time bomb." Ivers also told Hattervig and Wooton to inform the federal judges in the Twin Cities that he was "out of his fucking mind crazy" and mentioned that he was "glad they took [his letters and calls] seriously." Regarding Judge Wright, Ivers told Hattervig and Wooton "that fucking judge—you know, if she's scared and she's fearful, it's not my problem. She made her bed." Ivers remained upset with Judge Wright for "snatch[ing]" the life insurance policy at issue in the lawsuit "right out from under . . . [him]." Ivers concluded the conversation by again reiterating that "[he] possibly could be a walking

-4-

bomb." When Hattervig left his business card in an attempt to prompt Ivers to call him instead of court personnel if Ivers was angry, Ivers refused the card and again stated that: "[I]f they're living in fear, too fucking bad. It's what they deserve."

B.

Ivers later filed a second lawsuit against the life insurance company. See Ivers v. CMFG Life Ins. Co., No. 17-cv-5068-PJS-DTS (D. Minn. filed Nov. 9, 2017). This case was initially assigned to District Judge Patrick J. Schiltz and Magistrate Judge David T. Schultz. Magistrate Judge Schultz initially found that Ivers's complaint failed to state a claim for relief and referred Ivers to the District of Minnesota's Pro Se Project, which matches pro se litigants with private attorneys, to allow Ivers to obtain help in filing an amended complaint. Ivers was later matched with Attorney Anne Rondoni Tavernier, who was assisted by Attorney Lora Friedemann, a more experienced attorney at Rondoni Tavernier's firm.

Attorneys Rondoni Tavernier and Friedemann determined that Ivers did not have a claim against the life insurance company. They scheduled a call with Ivers to apprise him of their legal conclusions and to inform him that they would not be taking his case. In the first part of the approximately 30-minute call, Attorneys Rondoni Tavernier and Friedemann discussed the pending lawsuit and explained that Ivers would likely be unsuccessful due to the rulings made by Judge Wright in the earlier lawsuit. As they started to discuss the prior lawsuit, Ivers became angry, and he started to yell and use profane language. He started ranting about Judge Wright, and Attorney Friedemann transcribed parts of what he said, including the following statements: "This fucking judge stole my life from me."; "I had overwhelming evidence."; "Judge 'stacked the deck' to make sure I lost this case."; "Didn't read the fine print and missed the 30 days to seek a new trial—and 'she is lucky.' I was 'going to throw some chairs.'"; and "You don't know the 50 different ways I planned to kill her." The attorneys did not speak while Ivers was ranting, and after Ivers stopped

-5-

speaking, the attorneys concluded the call. Both attorneys were frightened by what Ivers had said, and Attorney Friedemann would later describe it as "a death threat against Judge Wright."

Following the call, and after consulting with their firm's ethics advisors, Attorneys Rondoni Tavernier and Friedemann contacted the coordinator of the Pro Se Project to inform her that Ivers "made a threat against Judge Wright." The coordinator, in turn, informed Judge Wright. The USMS was also alerted, and deputy marshals were sent to speak with Ivers. Ivers, however, refused to speak with the deputies and repeatedly came to the front door to shout at them. Although Ivers's sister attempted to intercede and explain to Ivers that the deputies merely "need to know that you're not serious about something like that, killing a judge, because you said it on the phone," Ivers told the deputies to "get the fuck out of here," and he continued to rant about Judge Wright. In addition to calling Judge Wright a racial epithet, he mentioned again that she was "that fucking judge who stole" his life, money, and future. He also said: "[Y]ou want to know what, if she doesn't sleep very good, fuck her," and he instructed the deputies to report that Ivers remained "crazy fucking angry."

C.

Ivers was later indicted for threatening to murder a federal judge, in violation of 18 U.S.C. § 115(a)(1)(B), and for interstate transmission of a threat to injure the person of another, in violation of 18 U.S.C. § 875(c). Ivers moved to exclude all of his statements made during the call with Attorneys Rondoni Tavernier and Friedemann on the grounds that they were subject to the attorney-client privilege. Following an evidentiary hearing, the district court denied Ivers's motion, finding that it could separate the threat statements, which it held were unprotected by the privilege because they were not made for the purpose of obtaining legal advice, from portions of the call that were made for the purpose of obtaining advice related to Ivers's

ongoing lawsuit. Ivers proceeded to trial, and the jury found him guilty on both counts. This appeal follows.

II.

Ivers first argues that the "threat statements" he made on the call with Attorneys Rondoni Tavernier and Friedemann were protected by the attorney-client privilege. This included his declaration that "You don't know the 50 different ways I planned to kill her." The scope of an evidentiary privilege is a mixed question of fact and law which this Court reviews de novo. See United States v. Ghane, 673 F.3d 771, 779-80 (8th Cir. 2012). We review the district court's factual findings underlying the privilege for an abuse of discretion and its legal conclusions de novo. See United States v. Smith, 383 F.3d 700, 706 (8th Cir. 2004). As the party seeking to assert the privilege, Ivers has the burden of showing that the privilege applies, Bouschor v. United States, 316 F.2d 451, 456 (8th Cir. 1963), and must show that the statements at issue were "made for the purpose of facilitating the rendering of legal services to the client." United States v. Spencer, 700 F.3d 317, 320 (8th Cir. 2012).

"The Federal Rules of Evidence provide that evidentiary privileges 'shall be governed by the principles of the common law . . . in the light of reason and experience.'" United States v. Jicarilla Apache Nation, 564 U.S. 162, 169 (2011) (alteration in original) (quoting Fed. R. Evid. 501). "Generally, it is well established under common law that confidential communications between an attorney and a client are privileged and not subject to disclosure absent consent of the client." United States v. Horvath, 731 F.2d 557, 562 (8th Cir. 1984). "[T]he attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system." United States v. Bauer, 132 F.3d 504, 510 (9th Cir. 1997). It "is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United

States, 449 U.S. 383, 389 (1981). As explained in Upjohn, the principle behind the privilege

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

Id.

However, "[p]rivileges, as exceptions to the general rule, are not lightly created nor expansively construed, for they are in derogation of the search for truth." In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 918 (8th Cir. 1997) (internal quotation marks omitted). Accordingly, the attorney-client privilege is narrowly construed and "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 403 (1976); see also Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 602 (8th Cir. 1977) ("While the privilege, where it exists, is absolute, the adverse effect of its application on the disclosure of truth may be such that the privilege is strictly construed.").

Threats of violence are not statements that fall under the scope of the attorney-client privilege. The Supreme Court has held that "[a] defendant who informed his counsel that he was arranging to bribe or threaten witnesses or members of the jury would have no 'right' to insist on counsel's . . . silence." Nix v. Whiteside, 475 U.S. 157, 174 (1986). Indeed, this type of communication is not made for the "purpose of facilitating the rendering of legal services[,]" Spencer, 700 F.3d at 320, but rather, is usually done to harass, intimidate, coerce, warn, or frighten the intended victim of the

-8-

Appellate Case: 19-1563    Page: 8    Date Filed: 07/23/2020 Entry ID: 4937086

threat or a person who hears the threat. Therefore, we agree with the Ninth Circuit's observation that a "[defendant's] threats to commit violent acts against [alleged victims are] clearly not communications in order to obtain legal advice." United States v. Alexander, 287 F.3d 811, 816 (9th Cir. 2002).[2]

Here, there is no dispute that Ivers enjoyed an attorney-client relationship with Attorneys Rondoni Tavernier and Friedemann or that parts of their telephone call were protected by the attorney-client privilege. Instead, the only issue is whether Ivers's threat statements, made towards the end of the call, are protected by the privilege.

The threat statements at issue were not protected by the attorney-client privilege, and we hold that they were properly received into evidence. Again, while the communications made in the first part of the call were indisputably for the purpose of obtaining legal services, as they concerned the merits of Ivers's lawsuit and the attorneys' opinions as to Ivers's prospects for success, Ivers made the threat statements towards the end of the call and only after the attorneys had finished discussing his case with him. Indeed, at the end of the call, Ivers became angry and began ranting about Judge Wright for approximately ten minutes. The attorneys did not engage with him or speak at any time during his tirade, and when he was finished, they simply ended the call. One of the attorneys later testified that Ivers's statements "weren't specifically relating to the advice" that he had received during the course of the call. Moreover, for the reasons discussed below, Ivers's statements, particularly

---

[2] While the scope of the attorney-client privilege and a lawyer's obligation of confidentiality are not coterminous, it is worth noting that, under the Minnesota Rules of Professional Conduct, there is an exception to the lawyer's duty of confidentiality to her client if "the lawyer reasonably believes the disclosure is necessary to prevent reasonably certain death or substantial bodily harm." Minn. R. Prof'l Conduct 1.6(b)(6).

his comment that "You don't know the 50 different ways I planned to kill her," undoubtedly threatened the life of a federal judge and were in no way necessary to further his civil lawsuit or made in order to obtain guidance in filing an amended complaint. For these reasons, it is clear that the statements at issue were not for the purpose of obtaining legal advice about his pending lawsuit against an insurance company and are not protected by the attorney-client privilege. See United States v. Sabri, 973 F. Supp. 134, 140-41 (W.D.N.Y. 1996) (finding that threat statements made by a defendant to his attorney concerning immigration officials were not protected by the attorney-client privilege).

Although Ivers spends much of his brief discussing the "predominant-motivation" and "sole-motivation" tests for the attorney-client privilege, arguing that these tests demonstrate that the statements were privileged, this argument is without merit.³ Ivers's argument concerning the predominant-motivation and sole-motivation tests is based on the incorrect assumption that the entire conference call with Attorneys Rondoni Tavernier and Friedemann was privileged. But courts routinely decide which specific communications between a client and his attorneys are privileged, and they often segregate privileged and non-privileged communications in particular conversations or documents. See, e.g., Alexander, 287 F.3d at 815; In re Grand Jury Proceedings, 841 F.2d 230, 233 (8th Cir. 1988). That some parts of the call were privileged does not mean that the entire call was privileged. The first part

---

³In order for the attorney-client privilege to protect a communication between a client and his attorney, the predominant-motivation test requires that the client's primary motivation in making the communication to the attorney is to obtain legal advice. See Edward J. Imwinkelried, The New Wigmore: Evidentiary Privileges § 6.11.2 (3d ed. 2020). The sole-motivation test requires that the client's sole motivation in making the communication to the attorney is to obtain legal advice. See id.

-10-

of the call in which Ivers was actually receiving legal advice is easily severable from the second part of the call, in which Ivers ranted about and threatened Judge Wright.

For these reasons, we see no error in the district court's determination that the threat statements in Ivers's call with Attorneys Rondoni Tavernier and Friedemann were not privileged.[4]

### III.

Next, Ivers asserts that there was insufficient evidence presented at trial to prove that he made a "true threat" of present or future harm towards Judge Wright. "[W]e will review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 852 F.3d 747, 753 (8th Cir. 2017) (internal quotation marks omitted).

"As a general matter, the First Amendment prohibits governmental actors from directing what persons may see, read, speak, or hear. Free speech protections do not extend, however, to certain categories or modes of expression, such as obscenity, defamation, and fighting words." Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621-22 (8th Cir. 2002) (en banc) (internal citation omitted). "True threats" are unprotected speech. Id. at 622. But "[w]hat is a [true] threat must be distinguished from what is constitutionally protected speech." Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam).

---

[4]Because the government did not argue to the district court that the crime-fraud exception to the attorney-client privilege applies, and concedes that it does not apply on appeal, we need not address that issue.

To determine what constitutes a "true threat," "[the fact-finder] must view the relevant facts to determine whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future." Pulaski Cnty. Special Sch. Dist., 306 F.3d at 622 (internal quotation marks omitted); see also United States v. Mabie, 663 F.3d 322, 333 (8th Cir. 2011) (noting that the "government need not prove that [defendant] had a subjective intent to intimidate or threaten," rather, it must show "that a reasonable person would have found that [defendant's] communications conveyed an intent to cause harm or injury"). This is for the fact-finder to determine "in the context of the totality of the circumstances in which the communication was made." United States v. Bellrichard, 994 F.2d 1318, 1323 (8th Cir. 1993). Relevant factors include:

> 1) [T]he reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence.

Pulaski Cnty. Special Sch. Dist., 306 F.3d at 623.

Ivers argues that the evidence was insufficient to demonstrate a true threat against Judge Wright because his statements did not evince a present or future intent to harm Judge Wright. In particular, Ivers focuses on the fact that his statements to Attorneys Rondoni Tavernier and Friedemann, and in particular, his statement that "You don't know the 50 different ways I planned to kill her," used the past tense, suggesting he lacked the intent to cause any present or future harm. Ivers also asserts that his language was intentionally exaggerated and hyperbolic and that he reasonably believed everything he said to his attorneys would remain confidential.

-12-

Although Ivers's brief focuses on the statements he made during his call with his attorneys, it is important to note that his fixation with, and anger towards, Judge Wright preceded the call by roughly two years. Indeed, during his first lawsuit, Ivers engaged in a campaign of sending threatening or intimidating communications to Judge Wright and others. Specifically, Ivers sent her a warning in which he stated that he was "becoming a very dangerous person" and later demanded "a jury trial or [his] fucking money." He also sent letters to Judge Wright and other judges in the District of Minnesota in which he demanded a new trial, calling Judge Wright corrupt, and stating that he would "smear her name." He later described himself to Chief Judge Tunheim's staff and Deputy Marshal Hattervig as a "walking bomb." When confronted by Hattervig and Wooton, Ivers refused to retract these statements, reiterated his anger, and expressed his pleasure that his statements were being taken seriously and frightening others. He confirmed that he remained "out of his fucking mind crazy." Hattervig also found out that Ivers was then serving a term of probation for threatening a Minnesota state court judge. It was in this context that Ivers, during his call with Attorneys Rondoni Tavernier and Friedemann, explicitly threatened violence against Judge Wright. See Bellrichard, 994 F.2d at 1323 (noting that the threat must be "viewed in textual context and also in the context of the totality of the circumstances in which the communication was made").

Contrary to Ivers's arguments, a jury could have reasonably concluded that, under the totality of the circumstances, Ivers's comments constituted a "true threat" of present or future violence. Ivers explicitly threatened Judge Wright's life during his call with Attorneys Rondoni Tavernier and Friedemann—it was reasonable to interpret his statement that "You don't know the 50 different ways I planned to kill her" as a death threat. During the call, Ivers began ranting about Judge Wright, and his tone and manner of speaking were threatening and of "barely controlled rage." He made other troubling statements, including the following: "This fucking judge stole my life from me," and "I was going to throw some chairs." Similarly, when

-13-

Appellate Case: 19-1563   Page: 13   Date Filed: 07/23/2020 Entry ID: 4937086

deputy marshals later confronted Ivers about the call, he initially refused to speak with them; shouted at them; referred to Judge Wright by a racial epithet; stated that Judge Wright was "that fucking judge who stole" his life, money, and future; and confirmed that he remained "crazy fucking angry." Even after Ivers's sister explained to him that the deputy marshals were only there to confirm that he did not actually mean to threaten the life of a federal judge, Ivers refused to retract his statements or assuage the fears of law enforcement.

It is important to note the effect of Ivers's statements and letters on those who heard or read them. See United States v. J.H.H., 22 F.3d 821, 827 (8th Cir. 1994) ("Evidence showing the reaction of the victim of a threat is admissible as proof that a threat was made."). At trial, several government witnesses testified that they found Ivers's statements to be threatening and frightening. Attorney Friedemann testified that she interpreted Ivers's statements as "a death threat against Judge Wright" and that nothing from the call indicated to her that Ivers had abandoned his plans to kill Judge Wright. Attorney Rondoni Tavernier testified that, based on the intensity of Ivers's anger, she was even worried for her own safety. Similarly, Deputy Marshal Wooton stated that he was concerned about the statements and that Ivers's conduct suggested that he could act on his threat.

Accordingly, because of the intensity of Ivers's expressed anger towards Judge Wright, his tone and demeanor, his prior conduct, his history of letters and communications to Judge Wright and others, and Judge Wright's prior rulings in Ivers's first lawsuit, the jury could reasonably infer a true threat of present or future harm from, among other statements, Ivers's comment that he "planned to kill [Judge Wright]."

Finally, we find unpersuasive Ivers's remaining arguments that there was insufficient evidence to sustain the verdict. Although we acknowledge that Ivers

-14-

made some of his statements in the call using the past tense, this fact is not, by itself, dispositive in light of the "textual context and also in the context of the totality of the circumstances." Bellrichard, 994 F.2d at 1323. Similarly, that Ivers believed his communications to Attorneys Rondoni Tavernier and Friedemann would remain confidential is not dispositive—again, whether the statement at issue is made directly to the intended victim is but one factor to consider in determining whether it is a threat. See Pulaski Cnty. Special Sch. Dist., 306 F.3d at 623. In view of the totality of the circumstances, the jury could reasonably conclude that Ivers made a true threat against Judge Wright, even if he did not think anyone other than Attorneys Rondoni Tavernier and Friedemann would hear it. And even if Ivers never had any intention of acting on the threat, that fact is irrelevant. See Bellrichard, 994 F.2d at 1324. Further, Ivers's repeated comments that he was "out of his fucking mind crazy" and concerning his desperation and financial circumstances could lead one to believe he would act upon his threat. Deputy marshals repeatedly visited with Ivers and told him to stop, but this did not stop Ivers nor did he retract his comments or show any remorse for them. Finally, we are unconvinced by Ivers's argument that he was exaggerating or employing rhetorical hyperbole, such as through boasting of "50 different ways" to murder Judge Wright. "That correspondence containing threatening language is phrased in outrageous terms does not make the correspondence any less threatening." Id. at 1322.

For the foregoing reasons, we conclude that sufficient evidence supports the jury's verdict.

IV.

Ivers also claims that the district court erred in instructing the jury on Count 1, threatening to murder a federal judge, in violation of 18 U.S.C. § 115(a)(1)(B), and Count 2, interstate transmission of a threat to injure the person of another, in violation

-15-

of 18 U.S.C. § 875(c). Specifically, he contends that, as to Count 1 the district court failed to instruct the jury that he must have subjectively intended his statement to be a threat. He also asserts that the district court failed to correctly define "threat" as to both Counts 1 and 2 because the jury instructions failed to include the requirement that the threat convey present or future harm. "We review a district court's formulation of jury instructions for abuse of discretion and consider whether the instructions correctly state the applicable law." United States v. Walker, 428 F.3d 1165, 1171 (8th Cir. 2005) (internal quotation marks omitted). "When viewing the instructions as a whole in light of the evidence and applicable law, we determine whether the instructions fairly and adequately submitted the issues in the case to the jury." United States v. Brede, 477 F.3d 642, 643 (8th Cir. 2007) (internal quotation marks omitted).

First, we find unpersuasive Ivers's argument that the district court erred by failing to instruct the jury that Ivers must have subjectively intended his statement to be a threat in order to convict him of Count 1. Ivers relies heavily on Elonis v. United States, 135 S. Ct. 2001 (2015), in which the Supreme Court held that 18 U.S.C. § 875(c) requires the jury to find that the defendant subjectively intended to threaten his victim. However, we have previously noted that Elonis "did not announce a universal definition of 'threat' that always requires the same *mens rea*," United States v. Harper, 869 F.3d 624, 626 (8th Cir. 2017), and our decision in United States v. Wynn, 827 F.3d 778 (8th Cir. 2016) forecloses Ivers's argument. In Wynn, we rejected the same argument that Ivers now makes, observing that the only mens rea requirement in 18 U.S.C. § 115(a)(1)(B) is "the intent to retaliate against the [federal judge] on account of the performance of official duties." Id. at 785 (internal quotation marks omitted). Accordingly, the government was not required to prove that Ivers subjectively intended his statement to be a threat—rather, the government needed to prove that Ivers made a true threat with the intent to retaliate against Judge Wright on account of the performance of her official duties. See id.; see also Elonis,

-16-

Appellate Case: 19-1563    Page: 16    Date Filed: 07/23/2020 Entry ID: 4937086

135 S. Ct. at 2010 ("[W]e read into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." (internal quotation marks omitted)).

Second, we reject Ivers's argument that the district court erred by incorrectly defining "threat" for Counts 1 and 2 because it failed to specifically include a temporal requirement that the threat convey present or future harm. See Pulaski Cnty. Special Sch. Dist., 306 F.3d at 622 (noting that a true threat is one that conveys an intent to cause present or future harm). Instruction No. 10 informed the jury that "[a]n expression to injure in the past may be circumstantial evidence of intent to injure in the present or future." Moreover, Ivers repeatedly argued to the jury that he could not be convicted for a past threat, that "[a] threat is now or in the future[,]" and that he lacked any future intent to harm Judge Wright. He also cross examined several witnesses about the distinction between the words "plan" and "planned," further demonstrating that the jury heard both argument and evidence concerning the distinction between past threats and threats of present or future harm. See Penry v. Johnson, 532 U.S. 782, 800 (2001) (observing that jury instructions should be reviewed in the context of the comments made by the government and defense counsel and "with a commonsense understanding . . . in the light of all that has taken place at the trial" (internal quotation marks omitted)). In light of Instruction No. 10 and the defense's arguments and evidence at trial, there was a sufficient basis from which the jury could infer that a threat must evince an intent to harm someone in the present or future. See United States v. Pereyra-Gabino, 563 F.3d 322, 329 (8th Cir. 2009) (noting that "jury instructions need not be technically perfect or even a model of clarity" (internal quotation marks omitted)). Accordingly, the district court did not abuse its discretion in failing to instruct the jury on the temporal requirement of a true threat with the specificity suggested by Ivers.

Appellate Case: 19-1563    Page: 17    Date Filed: 07/23/2020 Entry ID: 4937086

V.

Finally, Ivers contends that the cumulative effect of the district court's errors deprived him of a right to a fair trial. "We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Montgomery, 635 F.3d 1074, 1099 (8th Cir. 2011) (quoting United States v. Samples, 456 F.3d 875, 887 (8th Cir. 2006)). Because we find that Ivers has not shown that the district court erred with respect to his first three issues on appeal, his cumulative error argument must fall. See United States v. Anderson, 783 F.3d 727, 751 (8th Cir. 2015).

VI.

For these reasons, we affirm the judgment of the district court.

_____